# EXHIBIT 1

2026CV01325-10

EFILED
CLAYTON COUNTY, GA
5/14/2026 8:40 AM
Chanae Q. Clemons
CLERK SUPERIOR COURT

**IN THE SUPERIOR COURT OF CLAYTON COUNTY**
**STATE OF GEORGIA**

| | |
|---|---|
| THE CITY OF GRIFFIN, GEORGIA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case Number: 2026CV01325-10 |
| ) | |
| 3M COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MOTION FOR LEAVE TO AMEND**
**COMPLAINT AND BRIEF IN SUPPORT**

Plaintiff the City of Griffin, Georgia ("Griffin" or "Plaintiff") seeks to substitute certain fictitious defendants named in its Complaint, or in the alternative, to add a party defendant. Griffin filed this action on April 13, 2026, against sixteen named defendants and several fictitious defendants for their roles in polluting Griffin's primary water source with toxic "forever chemicals," or PFAS. (*See* Verif. Compl.) In support thereof, Griffin states as follows:

I.      **INTRODUCTION AND BACKGROUND**

This action arises out of the contamination of Griffin's drinking water supply with per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"), commonly known as "forever chemicals." Griffin draws its primary source water from the Flint River and operates two water treatment plants that serve the residents of Griffin, Georgia, and surrounding areas.

Griffin's investigation has revealed that the City of Atlanta, acting through its Department of Aviation, has purchased, stored, used, and discharged aqueous film-forming foam ("AFFF") containing PFAS at the Hartsfield-Jackson Atlanta International Airport (the "ATL Airport") for fire suppression and firefighter training. The ATL Airport is bordered by and hydrologically

AP

connected to the Flint River. Stormwater, runoff, and groundwater contaminated with PFAS from the ATL Airport flows directly into the Flint River and downstream past Griffin's drinking water intakes, contaminating Griffin's water supply.

Griffin seeks leave to amend its Complaint to assert claims of negligence, public nuisance, private nuisance, trespass, and violation of the Georgia Water Quality Control Act against Atlanta based on its use and release of civilian, commercial-grade AFFF at the ATL Airport.

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.  Leave to Amend Should Be Freely Given.

Generally, "[a] party may amend his pleading as a matter of course and without leave of court at any time before the entry of a pretrial order.…Leave shall be freely given when justice so requires." O.C.G.A. § 9-11-15(a). And "[a] party whose name is not known may be designated by any name; and, when his true name is discovered, the pleading may be amended accordingly." O.C.G.A. § 9-11-10(a). Leave of court is not required to substitute a party before the entry of a pretrial order. *See* O.C.G.A. § 9-11-15; O.C.G.A. § 9-11-10(a); and *Larson v. C.W. Matthews Contracting Co., Inc.,* 182 Ga. App. 356, 357 (1987) (physical precedent only) ("OCGA § 9-11-15(a) and (c) permit an amendment *changing* the party against whom a claim is asserted without leave of court at any time before the entry of a pretrial order.…The substitution or change of a party differs from the addition or deletion of a party.") (citations omitted; emphasis in original).

O.C.G.A. § 9-11-21 requires leave of court to drop or add parties. ("Parties may be dropped or added by order of the court on motion of any party…at any stage of the action and on such terms as are just."). Justice Benham reasoned in *Larson* that since "the substitution of appellee for John Doe was not the addition of a party to the action, compliance with OCGA § 9-11-21 was not necessary." 182 Ga. App. at 357.

- 2 -

**B. The Proposed Amendment Is Timely and Made in Good Faith.**

This action is in its early stages, and no trial date has been set. Griffin has diligently investigated the sources of PFAS contamination in its drinking water supply. The factual basis for the claims against Atlanta, including the extent of AFFF use at the ATL Airport and the hydrological connection between the ATL Airport and Griffin's water supply, has been developed through ongoing investigation and testing. This amendment is not made for any dilatory purpose and will not unduly delay the proceedings.

**C. Atlanta Will Not Be Prejudiced by the Amendment.**

On April 3, 2026, Griffin presented a statutory ante-litem notice upon Mayor Andre Dickens of the City of Atlanta pursuant to O.C.G.A. § 36-33-5, placing Atlanta on notice of the claims asserted herein before the filing of this action. Atlanta has therefore had ample opportunity to investigate Griffin's claims and cannot claim surprise or prejudice from their formal assertion in the Amended Complaint. Discovery has not yet commenced, and no scheduling order has been entered that would be disrupted by the addition of Atlanta as a defendant.

**D. The Proposed Amendment Is Not Futile.**

Griffin's proposed claims against Atlanta are well-founded in fact and law. Atlanta, acting in its proprietary capacity as the operator of a commercial civilian airport, purchased and used civilian, commercial-grade AFFF at the ATL Airport. This use resulted in the release of PFAS into the Flint River basin, which has directly contaminated Griffin's drinking water supply at levels that exceed the EPA's 2024 Maximum Contaminant Levels. These allegations state cognizable claims for negligence, nuisance, trespass, and violation of the Georgia Water Quality Control Act, O.C.G.A. § 12-5-51.

- 3 -

Moreover, Griffin timely complied with the ante-litem notice requirements of O.C.G.A. § 36-33-5 prior to asserting claims against Atlanta, and more than thirty (30) days have elapsed since presentment of that notice without resolution of Griffin's claims. The proposed amendment therefore satisfies all prerequisites to suit against a municipal corporation under Georgia law.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff, the City of Griffin, Georgia, respectfully requests that this Court grant leave to amend its First Amended Complaint to substitute certain fictitious defendants for the City of Atlanta, Georgia, or, in the alternative, to add the City of Atlanta as a party defendant pursuant to OCGA § 9-11-21. A proposed First Amended Complaint is attached hereto as Exhibit A.

Respectfully submitted this 13th day of May 2026.

**DAVIS LUCAS CARTER LLP**

210 East 2nd Avenue, Suite 301           */s/ J. Anderson Davis*
Rome, GA 30161                           J. ANDERSON DAVIS
Phone: 706-842-7555                      Georgia Bar No. 211077
adavis@davislucascarter.com             **Counsel for Plaintiff**


**THE WHALEN LAW FIRM LLC**

101 S Hill St.                           */s/ Andrew J. Whalen, III*
Griffin, GA 30223                        ANDREW J. WHALEN, III
Phone: 770-227-9456                      Georgia Bar No. 750625
ajwhalen3@whalenlaw.net                  **Counsel for Plaintiff**


**MCCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP**

411 West Crawford Street                 */s/ Robert Smalley*

- 4 -

Dalton, GA 30720
Phone: 706-278-4499
rsmalley@mccamylaw.com

ROBERT SMALLEY
Georgia Bar No. 653405
**Counsel for Plaintiff**

**FRIEDMAN, DAZZIO & ZULANAS, P.C.**

3800 Corporate Woods Drive
Birmingham, AL 35242
Phone: 205-278-7000
mconn@friedman-lawyers.com
lpatterson@friedman-lawyers.com
mlakes@friedman-lawyers.com
ewright@friedman-lawyers.com

 */s/ Matt Conn*
MATT CONN (CON062)
LEE PATTERSON (PAT060)
MADISON LAKES (GIT002)
ETHAN WRIGHT (WRI082)
**Counsel for Plaintiff**
*(Pro Hac Vice Forthcoming)*

**Exhibit "A"**

IN THE SUPERIOR COURT OF CLAYTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| THE CITY OF GRIFFIN, GEORGIA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case Number: 2026CV01325-10 |
| | ) | |
| 3M COMPANY; ATLAS ROOFING | ) | |
| CORPORATION OF MISSISSIPPI; THE | ) | |
| CITY OF ATLANTA, GEORGIA; | ) | |
| CLOROX MANUFACTURING | ) | |
| COMPANY; CORTEVA, INC.; DAIKIN | ) | |
| AMERICA, INC., DUPONT DE | ) | |
| NEMOURS, INC.; E.I. DUPONT DE | ) | |
| NEMOURS AND COMPANY; EIDP, | ) | |
| INC.; EXPRESS CONTAINER | ) | |
| SERVICES OF ATLANTA, LLC; | ) | |
| GEORGIA WASTE SYSTEMS, LLC; | ) | |
| STEPHENS INDUSTRIES, LLC; | ) | |
| TENSAR INTERNATIONAL | ) | |
| CORPORATION; THE CHEMOURS | ) | |
| COMPANY; THE CHEMOURS | ) | |
| COMPANY FC, LLC; THE SHERWIN- | ) | |
| WILLIAMS COMPANY; WASTE | ) | |
| MANAGEMENT OF GEORGIA, INC.; | ) | |
| and FICTITIOUS DEFENDANTS A-Z, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

Plaintiff the City of Griffin, Georgia (hereinafter referred to as "Griffin" or "Plaintiff")

brings this First Amended Complaint against the above-captioned Defendants and sets forth in

detail the parties, facts, legal claims, and damages with particularity, as follows:

1

**STATEMENT OF THE CASE**

1.      This case arises out of the historic and ongoing manufacture, sale, use, and discharge of per- and poly-fluoroalkyl substances ("PFAS")[1] contained in products used in commercial and other applications.

2.      The most toxic and studied chemicals in the PFAS group of chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"). These two (2) chemicals are referred to as "C-8" chemistries because they each contain eight (8) fluorinated carbon atoms. Due to the unparalleled strength of the carbon-fluorine bond, PFOS and PFOA will not degrade naturally in the environment. According to the United States Environmental Protection Agency ("EPA"), PFOS and PFOA are considered to be "persistent, bio-accumulative and toxic" ("PBT") and are harmful to public health and the environment.

3.      Because of their persistence in the environment, bioaccumulation in humans, animals and aquatic life, these man-made chemicals exist in the environment for an extraordinarily long time and have been labeled "forever chemicals" by the EPA.

4.      PFOS and PFOA chemicals were manufactured for many decades by the Chemical Manufacturer Defendants for use by industrial customers to make waterproof clothing, stain-resistant carpet and textile coatings, as well as certain firefighting foams.  The same characteristics that made these synthetic chemicals valued for their ability to repel oil, water, staining and fire

---

[1] As used herein, "PFAS" refers to all perfluorinated compounds, perfluorochemicals, polyfluorochemicals, perfluoroalkyl substances, polyfluoroalkyl substances, related chemicals that degrade to PFAS, and any precursors to PFAS, including but not limited to, perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), GenX, HFPO-DA, NEtFOSAA, NMeFOSAA, PFBS, PFDA, PFDoA, PFHpA, PFHxS, PFNA, PFTrDA, PFTA, PFUnA, 11Cl0PF3OUdS, 9Cl-PF3ONS, ADONA, PFPeS, PFHpS, 4:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 6:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), 8:2 FTS (1H, 1H, 2H, 2H,-perfluorohexane sulfonic acid), PFBA, PFPeA, PFMBA, PFMPA, PFEESA, PTFE, and NFDHA.

extinguishing, also make these chemicals resistant to any natural degradation or environmental breakdown.  In other words, the same chemical properties that made PFOS and PFOA so valuable and durable in products also made them dangerous to the environment and human health. According to the EPA, ingestion of these chemicals over a period of time can cause cancer and other serious illnesses "that decrease quality of life or result in death."

5.    The EPA has advised public drinking water systems to take immediate action to remove "forever chemicals" from public drinking water through the use of "best available technology."  The EPA further directed that public water systems must test for levels of PFOS and PFOA and publish the results in their Annual Water Quality Reports with a requirement that test results must be provided to the public "if levels of regulated PFAS exceed [EPA] standards."

6.    As of 2024, the EPA has established levels for six (6) PFAS chemicals found in drinking water associated with adverse health effects including liver cancer, kidney cancer, reduced immune system function, lipid levels, reproductive health harm, childhood developmental issues such as low birth weight, endocrine effects and cardiovascular effects.  Based on the best available science, the EPA determined there "is no safe level" of PFOS and PFOA in drinking water.

7.    Conventional drinking water systems are incapable of removing these "forever chemicals"—such as PFOS and PFOA—from drinking water. Because of the characteristics of these chemicals, they pass through conventional drinking water systems into the environment and eventually into the bloodstream of fish, birds, mammals and the general public.

8.    The Defendants in this case, which belong to a variety of different industries, have all caused or contributed—and are continuing to cause or contribute—to these toxic chemicals invading Griffin's drinking water.

9.      The Chemical Manufacturer Defendants created and sold hundreds of millions of pounds of these forever chemicals to industries and local governments throughout the State of Georgia, with full knowledge of their products' pernicious effects and likelihood of causing pollution to Griffin's water supply. Rather than taking efforts to warn or prevent this pollution, these Chemical Manufacturer Defendants actively concealed and withheld information from regulatory agencies, customers, and the general public, all the while causing these chemicals to continuously damage Griffin. These Chemical Manufacturer Defendants' efforts to conceal information related to PFAS and mislead regulators and the public continue to this day. The normal and expected use of the PFAS products manufactured and supplied by the Chemical Manufacturer Defendants to customers and downstream users has caused PFOS and PFOA to invade and pollute Griffin's drinking water. It was reasonably foreseeable, and in fact known, to the Chemical Manufacturer Defendants that the PFAS products they manufactured and sold to certain customers and downstream users would cause PFOS and PFOA to pollute Griffin's drinking water.

10.     The PFAS User Defendants purchased and used PFAS and/or products containing or degrading into PFAS in their industrial application and manufacturing processes. These Defendants have continuously caused and permitted PFAS-contaminated waste streams to discharge into the Flint River, Pates Creek, Shoal Creek, Sullivan Creek, J.W. Smith Reservoir, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, and/or the surrounding waterways upstream from where Griffin collects its drinking water. These Defendants do not have authorization to discharge PFAS, and they knew or should have known that their use and discharge of PFAS would pollute Griffin's water and cause Griffin injury. These Defendants' unauthorized discharges of PFAS upstream of Griffin's drinking water intake continue to this day.

11.     The Landfill Defendants have continuously accepted, and indeed profited from, PFAS-contaminated waste, which is disposed of in landfills owned and operated by these Defendants. Due to their improper operation of these landfills, the Landfill Defendants have caused and permitted PFAS-contaminated leachate to continuously discharge into the Flint River, Pates Creek, Shoal Creek, Sullivan Creek, J.W. Smith Reservoir, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, and/or the surrounding waterways upstream from where Griffin collects its drinking water. These Defendants do not have authorization to discharge PFAS-contaminated leachate, and they knew or should have known that their improper operations and discharge of PFAS would pollute Griffin's water and cause Griffin injury. These Defendants' improper operation and maintenance and unauthorized discharge of PFAS-contaminated leachate upstream of Griffin's drinking water intake continues to this day.

12.     Defendant the City of Atlanta, Georgia acting through its Department of Aviation, has purchased and used aqueous film-forming foams (a type of firefighting foam called "AFFF" that contains PFAS) at the Hartsfield-Jackson Atlanta International Airport (the "ATL Airport") for fire suppression and firefighter training. The ATL Airport is bordered by and hydrologically connected to the Flint River. PFAS-contaminated runoff and groundwater from the ATL Airport flows directly into the Flint River and downstream past Griffin's drinking water intakes, contaminating Griffin's water supply. Atlanta's use and release of civilian, non-military-specification AFFF at the ATL Airport is a distinct and independent source of PFAS contamination in Griffin's drinking water supply.

13.     The discharges of PFOS and PFOA into water systems upstream of Griffin's drinking water intake by the PFAS Users, the Landfill Defendants, the City of Atlanta, and other entities was reasonably foreseeable, and in fact known, to the Chemical Manufacturer Defendants.

14.     All of these Defendants have known for years—sometimes decades—that PFOS and PFOA should not be discharged via wastewater, stormwater, groundwater, runoff, or leachate to wastewater treatment plants or the environment.

15.     Nevertheless, the Defendants have jointly and continuously caused these "forever chemicals" to enter the Plaintiff's drinking water.

16.     Now, because of the PFAS pollution that Defendants have caused, Griffin must find a way to remove these harmful chemicals from its water in order to meet its obligations as a public water provider, comply with federal regulations and guidelines, and most importantly, protect human health and the environment.

17.     The Defendants have known or should have known that Griffin, like most public water systems, does not have the treatment technology necessary to remove PFAS from raw water. Therefore, Griffin will be required to upgrade to costly and sophisticated new treatment technologies in order to remove Defendants' PFAS from its public water supply.

**JURISDICTION AND VENUE**

18.     Jurisdiction is proper in this Court pursuant to Article 6, § 3, ¶ 1 of the Georgia Constitution and O.C.G.A. §§ 9-10-91 and 15-7-4(a)(2).

19.     The wrongful acts perpetrated by the Defendants which form the basis of this Amended Complaint, including the ongoing and continuing trespass and the creation of an ongoing and continuing nuisance, occurred and are occurring in Clayton County and have injured and will continue to injure the Plaintiff in Spalding County within the applicable statutes of limitations. The Defendants, jointly and severally, have caused ongoing and continuing damages to Plaintiff within the applicable statutes of limitations.

20.     Venue is proper in this Court pursuant to O.C.G.A. § 14-2-510(b)(1) because Defendant Express Container Services of Atlanta, LLC maintains its registered office in Clayton County.

21.     Venue is proper in this Court as to any Defendants that do not have an office in Clayton County because Defendants are joint tortfeasors and joint trespassers with the Defendant(s) that has/have a registered office in Clayton County.

22.     This lawsuit is brought under the laws of the State of Georgia. Plaintiff asserts no federal causes of action, invokes no federal statutes, and seeks no relief that is based on any federal statute or laws. Any federal claims are expressly disclaimed.

23.     Complete diversity does not exist between Plaintiff and all Defendants.

24.     Plaintiff expressly disclaims any cause of action or damages arising from or associated with any legal or factual claim based on alleged "MilSpec AFFF" as well as any potential claims arguably arising from any federal enclaves.

25.     Upon information and belief, none of Plaintiff's claims arise out of the manufacture or use of "MilSpec AFFF" and, therefore, "MilSpec AFFF" has not caused or contributed to its damages or the claims asserted in this lawsuit. The AFFF used by Defendant the City of Atlanta at the ATL Airport was civilian, commercial-grade AFFF that does not meet and was not required to meet military specifications. Atlanta's AFFF use at the ATL Airport was in its proprietary, civilian capacity as the operator of a commercial airport, not in any military capacity and not by or on behalf of the federal government. The ATL Airport is not a federal enclave and Plaintiffs' claims do not arise out of any AFFF used at any federal enclaves.

**NO CLASS ACTION PARTICIPATION**

26.     Several Defendants in this case have been sued in other cases involving allegations of PFAS pollution to public water systems. In 2023, 3M and DuPont settled nationwide, multi-district, class-action claims related to the contamination of public water supplies with PFAS for approximately $10 billion and $1 billion, respectively. *See In re: Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2:18-mn-2873-RMG (D.S.C.) ("*AFFF Litigation*").

27.     Prospective class members in the *AFFF Litigation* had the option of "opting out" of the 3M and DuPont settlements in order to pursue individual lawsuits against 3M and DuPont. Plaintiff validly and timely exercised its right to "opt out" of the *AFFF Litigation* Class Action Settlements with 3M and DuPont to pursue its claims in this lawsuit. Plaintiff has received confirmation from the Notice Administrator overseeing these settlements that its opt-out was in fact "compliant."

28.     On February 26, 2024, and March 29, 2024, Judge Richard Gergel, the United States District Court Judge for the District of South Carolina overseeing the *AFFF Litigation*, entered orders of final approval on the DuPont and 3M settlements, respectively. At no time has 3M, DuPont, or any other party raised objections to Plaintiff's decision to opt-out from the settlements.

29.     Leading up to the 3M and DuPont Class Action settlements, all municipalities, local governments and/or public water systems, such as Griffin, were enjoined from filing or prosecuting any legal action against 3M or DuPont related to PFAS contamination pending final approval orders and lifting of the stay and injunction by the Federal District Court in the *AFFF Litigation*.

**PARTIES**

I.    **Plaintiff The City of Griffin, Georgia**

30.    Plaintiff the City of Griffin, Georgia, located in Spalding County, is a municipal corporation organized under the laws of the State of Georgia, which operates a water system to enhance the health, safety, and general well-being of its citizens.

31.    Griffin provides drinking water to the citizens of Griffin, Georgia, and the surrounding areas. Griffin owns and operates two separate water treatment plants: J. Harry Simmons Water Treatment Plant located at 229 North Expressway Griffin, Georgia 30223 and the Dr. Brant D. Keller Water Treatment Plant (formerly known as the "Still Branch Water Treatment Plant") located at 2045 Flat Shoals Rd. Concord, Georgia 30206. Griffin also owns and operates two drinking water reservoirs known as the Heads Creek Reservoir and the Dr. Brant D. Keller Reservoir (formerly known as "Still Branch Regional Reservoir") which Griffin draws raw water from and pumps it to the plants for treatment. Griffin owns these properties and enjoys riparian rights to the water from the Flint River, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, as well as property rights over the water which it draws, treats, and sells to its customers. Griffin also wholesales its treated water to other municipalities and/or water systems in Georgia.

32.    Griffin's conventional water treatment facilities are incapable of removing or treating Defendants' PFAS to levels deemed safe by the federal government.

33.    Griffin has been and continues to be damaged due to the negligent, willful, and wanton conduct of the Defendants, as well as a result of the continuous nuisance and trespass caused by Defendants' past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFOS, PFOA and related fluorochemicals, such as PFHxS.

34.    As a direct and proximate result of Defendants' conduct, Griffin has suffered, and will continue to suffer, substantial economic and consequential damage, including but not limited to: expenses associated with installing temporary emergency filtration and pumping systems; pilot

- 9 -

program costs associated with permanent filtration systems capable of removing Defendants' PFAS from Griffin's drinking water; past and future costs associated with the purchase, installation, and operation of permanent filtration systems capable of removing Defendants' PFAS from Griffin's drinking water; costs associated with remediating Griffin's existing treatment and pumping facilities; damage to goodwill and reputation; and lost revenue and sales. In addition, Griffin seeks past, present, and future engineering, operating, and maintenance costs associated with remediation of Defendant's PFAS in Griffin's drinking water.

35.    Griffin seeks compensatory and punitive damages to the fullest extent allowed by Georgia law. Griffin seeks compensatory damages for filtration equipment, piping, and adequate permanent facilities necessary to operate filtering systems sufficient to remove all PFAS from drinking water. Griffin also seeks abatement of the continuous nuisance and trespass caused by Defendants, as well as equitable and injunctive relief compelling the Defendants to remediate their contamination and prevent additional releases of PFAS and other toxic chemicals into Griffin's drinking water supply.

## II.    Defendants

### A.    Chemical Manufacturers

36.    Defendant 3M Company ("3M") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in St. Paul, Minnesota. 3M is registered to do business in the State of Georgia. 3M has knowingly manufactured, sold, used and/or transported PFAS or products that contain and/or degrade into PFAS in the State of Georgia, which ultimately end up in the Flint River basin and Griffin's source water supply. PFAS manufactured, sold, used, and/or transported by 3M is currently contaminating Griffin's source water. Despite knowing for decades the pernicious effects of its PFAS products, 3M has and

continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. 3M knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Georgia, including Griffin's source water. As a result, 3M is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff.

37.    Defendant Daikin America, Inc. ("Daikin") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. Daikin does business in the State of Georgia. Upon information and belief, Daikin is a wholly owned subsidiary of Daikin Industries, Ltd. Daikin has and continues to manufacture, sell, use and/or transport PFAS and PFAS-related products or products which degrade into PFAS in the State of Georgia, which ultimately end up in the Flint River Basin and Griffin's source water supply. PFAS manufactured, sold, used, and/or transported by Daikin is currently contaminating Griffin's source water. Despite knowing for decades the pernicious effects of its PFAS products, Daikin has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Daikin knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Georgia, including Griffin's source water. As a result, Daikin is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff.

38.    Defendant E.I. du Pont de Nemours and Company is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware.

- 11 -

39.     Defendant DuPont de Nemours, Inc. is a corporation organized under the laws of the State of Delaware. DuPont de Nemours, Inc. does business in the State of Georgia.

40.     Defendant Corteva, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. Corteva, Inc. is registered to do business in the State of Georgia.

41.     Defendant EIDP, Inc., formerly known as "E.I. du Pont de Nemours and Company," is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. EIDP, Inc. is registered to do business in the State of Georgia.

42.     Defendants E.I. du Pont de Nemours and Company, Dupont de Nemours, Inc., Corteva, Inc., and EIDP, Inc. are hereinafter collectively referred to as "DuPont." DuPont has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS in the State of Georgia, which ultimately end up in the Flint River basin and Griffin's source water supply. PFAS manufactured, sold, used, and/or transported by DuPont is currently contaminating Griffin's source water. Despite knowing for decades the pernicious effects of its PFAS products, DuPont has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. DuPont knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Georgia, including Griffin's source water. As a result, DuPont is causing and contributing to a continuous nuisance, trespass, and injury to Plaintiff.

- 12 -

43. Defendant The Chemours Company is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company is registered to do business in the State of Georgia.

44. Defendant The Chemours Company FC, LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Wilmington, Delaware. The Chemours Company FC, LLC is registered to do business in the State of Georgia.

45. The Chemours Company and The Chemours Company FC, LLC are hereinafter collectively referred to as "Chemours." Chemours has manufactured, sold, used, and/or transported PFAS and PFAS-related products or products which degrade into PFAS into the State of Georgia. PFAS manufactured, sold, used, and/or transported by Chemours is currently contaminating Griffin's source water. Despite knowing the pernicious effects of its PFAS products, Chemours has and continues to conceal information and mislead regulators and the public concerning the effects of these toxic substances. Chemours knew or should have known that the PFAS products it supplied would, through ordinary usage and industry custom, discharge into waterways via wastewater emissions and other releases and cause contamination in the State of Georgia, including Griffin's source water. As a result, Chemours is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

46. 3M, Daikin, DuPont, and Chemours are collectively referred to herein as the Chemical Manufacturer Defendants.

47. The Chemical Manufacturer Defendants have operated in the past, and/or are currently operating, manufacturing facilities related to the production of products and/or chemicals that contain or degrade into certain PFAS, including PFOS and PFOA. The Chemical

Manufacturer Defendants use PFAS as part of their manufacturing processes or otherwise supply PFAS or products that contain or degrade into PFAS to various industries.

48.    Defendants 3M and Daikin manufactured PFAS and/or products containing or degrading into PFAS at their plants located in Decatur, Alabama.

49.    Upon information and belief, Defendants DuPont and Chemours sold PFAS and/or PFAS-containing products to Daikin at its plant located in Decatur, Alabama.

50.    PFAS, and products that contain or degrade into PFOS and PFOA, are manufactured and sold by the Chemical Manufacturer Defendants to the PFAS Users, the City of Atlanta, and/or Fictitious Defendants F-U. These products are subsequently discharged both directly and indirectly into the Flint River, Pates Creek, Shoal Creek, Sullivan Creek, J.W. Smith Reservoir, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, and other tributaries and watersheds in the surrounding areas.  Defendants' discharges of PFAS occur upstream of Griffin's drinking water intake and, as a direct result, contaminate Griffin's drinking water supply.

51.    The Chemical Manufacturer Defendants have known for years that PFAS are harmful to human health and resistant to degradation or filtration by conventional treatment systems. The Chemical Manufacturer Defendants had full knowledge that the PFAS products they manufactured and supplied to industrial users and other customers would invade waters of the state of Georgia, including the environment and surrounding areas from where Griffin collects its drinking water, via wastewater effluent and other discharges and ultimately contaminate Griffin's drinking water supply.

52.    Upon information and belief, the Chemical Manufacturer Defendants have at various times exercised control over certain customers' application and use of PFAS products. The Chemical Manufacturer Defendants have all exercised control over the information (or lack

thereof) provided to their customers regarding the safe handling, use, and disposal of PFAS products.

53.    The "heart" and "gravamen" of Plaintiff's claims against the Chemical Manufacturer Defendants is this: these Defendants produced and supplied PFAS-containing products to private industries and local governments, with full knowledge that these persistent, bioaccumulative, and toxic substances would contaminate the environment and Griffin's source water through wastewater and other manufacturing discharges, all while concealing and withholding critical information regarding the harmful effects of their products.

54.    The Chemical Manufacturers have caused and contributed, and are still causing and contributing to, a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products that contain or degrade into PFAS, as well as their continuing efforts to conceal information related to their products and mislead regulators and the public concerning the pernicious effects of these substances.

**B.  PFAS Users**

55.    Defendant Atlas Roofing Corporation of Mississippi ("Atlas Roofing") is a corporation organized and existing under the laws of the State of Mississippi, with its principal place of business located in Atlanta, Georgia. Atlas Roofing is registered to do business in the State of Georgia. Atlas Roofing operates an asphalt shingle and coating materials manufacturing facility located at 100 Pine View Dr, Hampton, Georgia 30228. According to the Atlas Roofing website, Atlas Roofing has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturer Defendants and/or Fictitious Defendants A-E for use in its manufacturing processes. Atlas Roofing's manufacturing processes have caused and are continuing to cause discharges of

- 15 -

PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, Atlas Roofing is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

56.     Defendant Clorox Manufacturing Company ("Clorox") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Oakland, California. Clorox is registered to do business in the State of Georgia. Clorox operates two manufacturing facilities located at 17 Lake Mirror Road, Forest Park, Georgia 30297 and 115 Lake Mirror Road, Forest Park, Georgia 30297. Clorox's manufacturing operations include bleach, home-care goods, Pine-Sol, disinfecting wipes, sprays, and cleaning chemicals. Upon information and belief, Clorox has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturer Defendants and/or Fictitious Defendants A-E for use in its manufacturing processes, and Clorox's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, Clorox is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

57.     Defendant Express Container Services of Atlanta, LLC ("Express Container") is a domestic limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in Avenel, New Jersey. Express Container is registered to do business in the State of Georgia, and its registered office is located in Clayton County. Express Container owns and/or operates a container cleaning facilities located at 1675 Nolan Court, Morrow, Georgia 30260. Upon information and belief, Express Container's container cleaning processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, Express Container is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

- 16 -

58.    Defendant PolyNT Composites USA Inc. ("PolyNT") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Carpentersville, Illinois. PolyNT is registered to do business in the State of Georgia. PolyNT operates a chemical plant at 71 Barnett Rd, Forest Park, Georgia 30297. Upon information and belief, PolyNT has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturer Defendants and/or Fictitious Defendants A-E for use in its manufacturing processes, and PolyNT manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, PolyNT is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

59.    Defendant The Sherwin-Williams Company ("Sherwin-Williams") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Cleveland, Ohio. Sherwin-Williams is registered to do business in the State of Georgia. Sherwin-Williams operates an industrial-grade paints and coatings manufacturing facility at 6795 Jonesboro Rd, Morrow, Georgia 30260. Upon information and belief, Sherwin-Williams has purchased PFAS and/or PFAS-containing products from the Chemical Manufacturer Defendants and/or Fictitious Defendants A-E for use in its manufacturing processes, and Sherwin-Williams manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater and/or stormwater upstream of Griffin's drinking water source. As a result, Sherwin-Williams is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

60.    Defendant Stephens Industries, LLC ("Luck Stone") is a domestic limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business located in Atlanta, Georgia. Luck Stone is registered to do business in the State of Georgia. Upon information and belief, Luck Stone produces and distributes crushed stone, sand,

- 17 -

and gravel; recycles construction and demolition debris; and operates a C&D landfill for processing waste materials from construction and demolition projects at 5173 Pelican Dr, Atlanta, Georgia 30349. Upon information and belief, Luck Stone's business processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, Luck Stone is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

61.    Defendant Tensar International Corporation ("Tensar") is a domestic corporation organized and existing under the laws of the State of Georgia, with its principal place of business located in Alpharetta, Georgia. Tensar is registered to do business in the State of Georgia. Tensar operates an advanced geogrid system manufacturing facility located at 1210 Citizen Parkway, Morrow, Georgia 30260. Upon information and belief, Tensar's manufacturing processes have caused and are continuing to cause discharges of PFAS-contaminated wastewater upstream of Griffin's drinking water source. As a result, Tensar is causing and contributing to a nuisance, trespass, and injury to Plaintiff.

62.    The PFAS Users have in the past and/or currently own and/or operate manufacturing facilities related to the coating, flooring, textile, metal fabrication, paint, and paper industries, which have in the past and/or currently use PFAS in their manufacturing processes. These facilities are located upstream of Griffin's drinking water intakes located in the Flint River basin.

63.    Industrial wastewater discharged in the past and currently from the PFAS Users' manufacturing facilities contains high levels of PFAS, which have invaded the environment where Griffin collects its drinking water. In addition to discharging PFAS in industrial wastewater, the PFAS Users have also discharged—and are continuing to discharge—PFAS by way of releases,

- 18 -

leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater.

64. The PFAS Users knew or should have known that PFAS are harmful to human health and the environment, and that their PFAS-contaminated waste streams would invade and persist in the environment and Griffin's drinking water supply.

65. The PFAS Users have known or should have known that the release of PFAS into the environment through wastewater, stormwater and other discharges is prohibited by the PFAS Users' operative permits and/or applicable state and local laws and regulations.

66. The PFAS Users have caused and contributed, and are still causing and contributing, to a continuous nuisance and trespass through their past and present manufacture, use, purchase, sale, supply, discharge, and/or release of PFAS and products containing or degrading into PFAS.

## C. Landfill Defendants

67. Defendant Georgia Waste Systems, LLC ("Georgia Waste Systems"), formerly known as "Georgia Waste Systems, Inc." is a domestic limited liability company organized and existing under the laws of the State of Georgia, with its principal place of business in Houston, Texas.

68. Defendant Waste Management of Georgia, Inc. ("WM") is a domestic corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Houston, Texas.

69. Defendants Georgia Waste Systems, LLC and Waste Management of Georgia, Inc. are hereinafter referred to as "WM."

70.     Upon information and belief, the Rolling Hills Landfill is a closed municipal solid waste landfill owned and operated by WM. Rolling Hills Landfill is located at or about 870 Sullivan Road, College Park, Georgia 30349 and/or 664 Lees Mills Road, College Park, Georgia, 30349.

71.     Upon information and belief, the Rolling Hills Landfill accepted waste from 1965 until its closure on or about October 2, 1991. Upon information and belief, Rolling Hills Landfill accepted waste, wastewater, biosolids, sludge, and/or other forms of waste that contain and/or degrade into PFAS. Through its unauthorized direct and indirect discharge of wastewater, stormwater, and/or leachate contaminated with PFAS, the Rolling Hills Landfill is causing and contributing to a nuisance, trespass, and injury to Plaintiff in Griffin, Georgia.

72.     The Landfill Defendants own, operate and/or maintain the Rolling Hills Landfill, which has accepted PFAS-contaminated wastes from the PFAS Users and other sources and thereafter improperly discharged PFAS-contaminated leachate into an unnamed tributary to Sullivan Creek directly and/or via leachate disposal into wastewater treatment plants. The Landfill Defendants are not permitted or authorized to discharge leachate contaminated with PFAS, and knew or should have known that their discharges of PFAS-contaminated leachate would invade Griffin's source of drinking water. In some instances, these discharges began over thirty (30) years ago and yet continue to this day.

73.     The Landfill Defendants' continuing discharges of PFAS occur upstream of Plaintiff's drinking water intake and, as a direct result, contaminate the Plaintiff's water supply.

**D. AFFF Airport Defendant**

74.     Defendant the City of Atlanta, Georgia ("Atlanta") is a municipal corporation organized and existing under the laws of the State of Georgia.

75. Atlanta owns and operates Hartsfield-Jackson Atlanta International Airport (the "ATL Airport"), commonly recognized as one of the busiest airports in the world. The ATL Airport is located in College Park, Georgia, primarily in Clayton County, and is bordered by and hydrologically connected to the Flint River. Most of the ATL Airport is located in Clayton County; however, some of it is located in Fulton County.

76. Upon information and belief, the ATL Airport has purchased, stored, and used AFFF containing PFAS numerous times over several years for fire suppression and firefighter training at the ATL Airport.

77. The AFFF purchased and used by Atlanta at the ATL Airport was civilian, commercial-grade AFFF—not military specification ("MilSpec") AFFF. Atlanta's purchase and use of AFFF was in its proprietary capacity as the operator of a commercial civilian airport. Atlanta's use of AFFF was not mandated by any military or federal requirement, and Atlanta did not operate the ATL Airport as a military installation or federal enclave. Neither Atlanta nor the suppliers of AFFF to Atlanta act as federal contractors in the manufacture, supply, and/or use of commercial-grade AFFF at the ATL Airport. The claims against Atlanta in this Amended Complaint accordingly do not implicate any military AFFF use and are expressly outside the scope of any MilSpec AFFF disclaimer contained herein.

78. Atlanta, through its Department of Aviation, knew or should have known that AFFF contains PFAS, that PFAS are persistent, bioaccumulative, and toxic, and that the use and release of AFFF at the ATL Airport would cause PFAS to contaminate the Flint River and downstream water supplies, including Griffin's drinking water.

79. Through its use of AFFF at the ATL Airport, Atlanta has allowed forever chemicals to enter the Flint River basin. PFAS have been detected in dangerous and high levels in the Flint

River and hydrologically connected waterways below the ATL Airport. Runoff and/or groundwater contaminated with PFAS from the ATL Airport pollutes the Flint River as it flows from the ATL Airport through and past Griffin's drinking water intakes.

80. Atlanta, acting by and through its Department of Aviation, has caused and contributed, and is continuing to cause and contribute, to a continuous nuisance, trespass, and injury to Griffin by releasing PFAS into the Flint River basin through the use and discharge of AFFF.

81. On April 3, 2026, within six months of the events giving rise to the claims asserted herein, Griffin sent a statutory ante-litem notice pursuant to O.C.G.A. § 36-33-5, via certified mail to Mayor Andre Dickens of the City of Atlanta. The notice identified the time, place, and extent of Griffin's injuries; described the negligence of the City of Atlanta that caused those injuries; and demanded a specific monetary amount constituting a statutory offer of compromise, as required by O.C.G.A. § 36-33-5(e). More than thirty (30) days have elapsed since transmission of the notice, and Atlanta has failed to settle or otherwise resolve Griffin's claims within the time required by O.C.G.A. § 36-33-5(c).

### E. Fictitious Defendants

82. Fictitious Defendants A-E, whether singular or plural, entity or entities, are those defendants who have operated in the past, and/or are currently operating, manufacturing facilities related to the production of products and/or chemicals that contain or degrade into certain PFAS chemicals, including PFOS and PFOA, and that have sold PFAS and/or products that contain or degrade into PFAS, to the PFAS Users and/or Fictitious Defendants F-U, which are subsequently discharged both directly and indirectly into the Flint River, Mud Creek, Shoal Creek, Sullivan Creek, J.W. Smith Reservoir, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, and/or other

tributaries and watersheds in the surrounding areas, upstream of Plaintiff's drinking water intake and, as a direct result, contaminate the Plaintiff's water, similar to the Chemical Manufacturer Defendants in Section II.A.

83.    Fictitious Defendants F-U, whether singular or plural, entity or entities, are those defendants who have owned and/or operated in the past, and/or currently own and/or operate, manufacturing facilities, industrial plants, airports, or any other related properties which have purchased, used and/or utilized PFAS products and discharged wastewater and/or stormwater containing PFAS into the environment and/or surface water source(s) where Plaintiff collects its drinking water, whether directly or indirectly, similar to the PFAS Users in Section II.B. Fictitious Defendants F-U also include those defendants who have discharged and/or continue to discharge PFAS from manufacturing facilities, industrial plants, airports, or any other related properties by way of releases, leaks, and spills into stormwater drains which feed into local creeks, waterways, streams, rivers and groundwater and contaminate Plaintiff's drinking water supply.

84.    Fictitious Defendants V-Z, whether singular or plural, entity or entities, are those defendants who owned, operated and/or maintained, and/or currently own, operate and/or maintain, a landfill or other waste disposal facility/site that has accepted PFAS-contaminated wastes from the PFAS Users and/or other sources (including Fictitious Defendants F-U) and thereafter discharged PFAS-contaminated wastewater, stormwater and/or leachate, directly or indirectly, into the water source(s) where Plaintiff collects its drinking water and ultimately contaminate Plaintiff's drinking water supply, similar to the Landfill Defendants in Section II.C.

85.    Plaintiff avers that the identities of Fictitious Defendants A-Z are otherwise unknown to Plaintiff at this time, or if their names are known to Plaintiff, their identities as proper party defendants are not known to Plaintiff at this time and/or their actions/omissions as liable

parties are not known to Plaintiff at this time, and their true names will be substituted by amendment when ascertained.

### F. All Defendants

86.    The PFAS manufactured and sold by the Chemical Manufacturer Defendants, purchased, used, and discharged by the PFAS Users, the City of Atlanta, and/or accepted and subsequently discharged by the Rolling Hills Landfill, resist degradation, including during processing at wastewater treatment facilities, and ultimately contaminate Flint River, Pates Creek, Shoal Creek, Sullivan Creek, J.W. Smith Reservoir, Heads Creek Reservoir, Dr. Brant D. Keller Reservoir, and other tributaries and watersheds in and around Spalding County and Clayton County, Georgia.

87.    Defendants, individually and collectively, have caused or contributed to cause continuous PFAS pollution in the environment and the surface water in and around Spalding County and Clayton County, Georgia. Defendants' PFAS cannot be adequately removed from the Plaintiff's water supply by existing water treatment processes and technologies presently in use and available at Plaintiff's water treatment facilities.

### FACTUAL ALLEGATIONS

I.    **Defendants Have Known for Decades That "Long-Chain" PFAS are a Threat to Human Health and the Environment.**

88.    PFAS are man-made, synthetic chemicals used to impart oil-, water-, and stain-resistance to various products, including carpet, paper, and textiles, as well as certain fire extinguishing properties. The same chemical properties that provide these enhanced attributes also make PFAS resistant to degradation and persistent in the environment.

89.    PFAS are known to the EPA and the Defendants as "forever chemicals" because these man-made chemicals persist in the environment for extremely long periods and do not

- 24 -

degrade like other chemicals. PFAS accumulate in the human body through the process of bioaccumulation. In fish and mammals, PFAS accumulate, build, and increase though biomagnification. PFAS also migrate through surface water and groundwater, allowing PFAS compounds to travel long distances while causing extensive contamination.

90.    Since PFAS do not degrade naturally and are synthetic "forever chemicals," PFAS released into the environment ten (10), twenty (20), or thirty (30) years ago will remain present and will continue causing pollution that is a threat to public health, unless removed by very specific filtration methods.

91.    Although there are thousands of chemical substances that fall under the PFAS umbrella, the two most notorious PFAS chemicals are perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").  These two (2) chemicals are also referred to as C-8s and/or long-chain fluorochemicals.

92.    PFOS and PFOA are considered "long-chain" PFAS (sometimes referred to as "C-8" chemistries), because they contain eight (8) fluorinated carbon atoms. Defendants knew that, because of the strong carbon-fluorine bond, PFOS and PFOA will not degrade naturally in the environment.

93.    According to the EPA, 3M was the sole manufacturer of PFOS in the United States and the principal manufacturer of PFOS worldwide. Upon information and belief, 3M supplied PFOS and/or products containing or degrading into PFOS to the PFAS Users and other entities for use in their manufacturing processes and other operations.

94.    DuPont, Daikin, and 3M all manufactured PFOA and/or products containing or degrading into PFOA. Upon information and belief, DuPont, Daikin, and 3M supplied PFOA

and/or products containing or degrading into PFOA to the PFAS Users and other entities for use in their manufacturing processes and other operations.

95.    3M and DuPont began studying the toxicity of PFOS and PFOA as early as the 1950s and 1960s.

96.    By the 1970s, 3M and DuPont were aware that their products persisted indefinitely in the environment. 3M also learned during this time that PFOS was present in the blood of its employees and the general public.

97.    In the 1970s and 1980s, 3M began conducting animal studies to determine the possible carcinogenicity of PFAS chemicals. One such study, an investigation into the effects of PFOS on rhesus monkeys, had to be aborted prior to the conclusion of the study "[b]ecause of unexpected early mortalities in all monkeys at all levels" of PFOS dosage. In 1978, a 3M interoffice correspondence concluded that "[r]ecent animal studies have shown that FC-95 [PFOS] is more toxic than was previously believed."

98.    By the 1980s and 1990s, 3M and DuPont were fully aware that PFOS and PFOA were toxic and persistent in the environment and that conventional treatment methods were ineffective at removing these pollutants. Nevertheless, the two companies actively hid their findings from regulators and the general public. In 1988, a 3M internal memo raised concerns that 3M had "perpetuate[d] the myth that these fluorochemical surfactants are biodegradable."

99.    In 1997, 3M prepared a Material Safety Data Sheet (MSDS) for a product containing PFAS. The MSDS contained the following warning:

> **CANCER:**
>   WARNING: Contains a chemical which can cause cancer. (3825-26-1)
>   (1983 and 1993 studies conducted jointly by 3M and DuPont).

100.    This warning was removed from subsequent MSDSs.

101.    In the late 1990s, 3M began a comprehensive, multi-city investigation into the extent of its PFAS pollution. It found an unending cycle of pollution in which Chemical Manufacturers, PFAS Users, and Landfills all play a role in continuing the invasion of PFAS in surface and groundwater, wastewater, and ultimately, drinking water.

102.    3M also concluded during this investigation that reverse osmosis is the only treatment method capable of removing all PFAS.

103.    In 1999, Richard Purdy, one of 3M's lead scientists on the multi-city study, resigned from his position due to his "profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS) . . . and its precursors."

104.    Mr. Purdy's letter, which was also sent to a representative of the EPA, further stated that PFOS "is the most insidious pollutant since PCB" and "more stable than many rocks."

105.    Following Mr. Purdy's letter, the EPA began an investigation into PFOS after receiving data that "PFOS was persistent, unexpectedly toxic, and bioaccumulative (PBT)." Federal Register/Vol. 68, 2003.

106.    During its subsequent investigation of 3M, the EPA disclosed that "following negotiations with EPA, 3M . . . announced that it will voluntarily phase out perfluorooctanyl sulfonate ("PFOS") chemistry." The EPA determined that PFOS was toxic and accumulated to a high degree in humans and animals. The EPA's preliminary risk assessment found unacceptable margins of exposure for workers and possibly the general population exposed to PFOS.

107.    The EPA concluded that "PFOS represents an unacceptable technology that should be eliminated to protect human health and the environment from potentially severe long-term consequences." Shortly thereafter, the EPA expanded its investigation to perfluorooctanoic acid

(PFOA), stating "EPA was concerned in part because 3M had also found PFOA in human blood during the studies on PFOS."

108.    After 3M announced that it was withdrawing PFOS and PFOA from the market in 2000, DuPont and Daikin continued to manufacture and/or use PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

109.    Upon information and belief, the PFAS Users continued to purchase, use, and discharge PFOA and products containing or degrading into PFOA with full knowledge that the substances had been withdrawn by 3M due to environmental and potential health risks to the public.

110.    By 2006, the majority of an EPA Science Advisory Board expert committee had recommended that PFOA be considered "likely to be carcinogenic to humans." Similarly, an independent C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure, based on epidemiological and other data in the Mid-Ohio Valley.

111.    Despite the growing awareness that PFOA was just as persistent, bio-accumulative, and toxic as PFOS, DuPont and Daikin continued to manufacture and supply PFOA and products containing and/or degrading into PFOA until at least 2015.

112.    All of the Defendants have known that PFOS and PFOA are toxic, persistent, and bioaccumulative.

113.    All of the Defendants have known or should have known that the ordinary usage of products containing or degrading to PFAS in manufacturing processes will cause PFAS to discharge into the environment via industrial wastewater effluent, stormwater runoff or other discharges.

114.    All of the Defendants have known that permits and/or state and local laws and regulations prevent the discharge of PFAS into conventional wastewater treatment plants incapable of removing or treating PFAS.

115.    All of the Defendants have known that the PFAS products used by the PFAS Users would ultimately enter the Plaintiff's drinking water supply, and that Plaintiff's conventional drinking water treatment systems are incapable of removing PFOS and PFOA from water supplies.

116.    Nevertheless, the Defendants in this case supplied, used, purchased, and/or accepted PFOS and PFOA, and/or products containing or degrading into PFOS and PFOA, without using adequate care to prevent the contamination of Plaintiff's water supply.

117.    PFAS manufactured, used, and discharged by the Defendants are still present at dangerously high levels in Plaintiff's drinking water supply.  Some of these Defendants are still discharging wastewater, leachate, stormwater and/or other types of discharges containing PFAS into the Plaintiff's water supply.

## II.    "Short-Chain" PFAS

118.    After 3M phased out "long-chain" PFAS, it began selling "short-chain" PFAS compounds (sometimes referred to as "C-6" and "C-4" chemistries), and/or products that contained or degraded into "short-chain" PFAS, to the PFAS Users.  DuPont and Daikin eventually converted to "short-chain" PFAS as well.

119.    In or around 2015, DuPont spun off its Performance Chemicals business line into a new company, Chemours, which continued selling and marketing "short-chain" PFAS, including but not limited to HFPO-DA (or "Gen-X").

- 29 -

120.    The "short-chain" PFAS compounds sold and/or used by the Chemical Manufacturer Defendants included and/or degraded into PFBS, PFBA, PFHxA, PFHxS, PFNA, PFPeA, Gen-X, and more.

121.    Defendants knew or should have known that these "short-chain" PFAS still contained toxic "long-chain" PFAS—including PFOS and/or PFOA—as a byproduct and/or an impurity.  So, while advertising their short-chain PFAS as an alternative to long-chain C8s, the Chemical Manufacturer Defendants were continuing to manufacture and sell their most toxic chemicals to customers and, in turn, putting these chemicals into waste streams and the environment.

122.    Upon information and belief, Defendants continue to supply, use, purchase, accept, and/or discharge "short-chain" PFAS, and/or products containing or degrading into "short-chain" PFAS, without using adequate care to prevent the contamination of Plaintiff's water supply, to this day.

III.    **AFFF and the ATL Airport**

123.    Aqueous Film-Forming Foam ("AFFF") is a type of firefighting suppressant that has been widely used at airports, industrial facilities, and municipal fire departments for decades. AFFF contains significant concentrations of PFOS, PFOA, and other PFAS compounds as active components.

124.    AFFF was commercially sold and manufactured in both military-specification ("MilSpec") and civilian, commercial-grade formulations. MilSpec AFFF is manufactured to meet specific U.S. military procurement standards and is purchased and used by or on behalf of the U.S. Department of Defense. Civilian AFFF, by contrast, is commercially available and often purchased

and used by non-military entities such as airports, industrial facilities, and municipalities. Civilian AFFF is not subject to military procurement requirements.

125. The ATL Airport has used civilian, commercial-grade AFFF for fire suppression and firefighter training. Atlanta purchased this civilian AFFF in its proprietary capacity as the operator of a commercial international airport, not pursuant to any military or federal mandate. The use of AFFF at the ATL Airport was governed by civilian aviation and fire safety regulations, not military specifications.

126. Upon information and belief, the ATL Airport first purchased AFFF for use in firefighting and training as early as 1990 and has continued such use for many years thereafter. The ATL Airport purchased, stored, used, and discharged AFFF in training exercises, in response to aircraft fires, and in other firefighting activities at and adjacent to the airport grounds.

127. The ATL Airport is situated primarily in Clayton County, Georgia, and is bordered on multiple sides by land that drains into the Flint River and its tributaries. The ATL Airport is hydrologically connected to the Flint River. Stormwater runoff from the ATL Airport, as well as groundwater infiltrated with PFAS from training exercises and fire suppression activities, flows into the Flint River and hydrologically connected waterways that supply Griffin's drinking water intakes downstream.

128. Forever chemicals have been detected in dangerous and high levels in the Flint River and hydrologically connected waterways below the ATL Airport. The ATL Airport is a proximate and contributing source of the PFAS contamination that has been detected in Griffin's water supply.

129. Atlanta knew, or should have known, that AFFF contains PFAS. By at least the late-1990s and early 2000s, information concerning the environmental persistence and toxicity of

PFAS in AFFF was available to airport operators, including through industry publications, environmental regulatory guidance, and communications from AFFF manufacturers. Atlanta knew, or should have known, that the use of AFFF at the ATL Airport would result in PFAS entering the Flint River basin and contaminating downstream drinking water supplies, including Griffin's.

130.   Atlanta knew, or should have known, that PFAS are persistent and cannot be removed from drinking water supplies by conventional treatment methods. Despite this knowledge, Atlanta continued to purchase, use, and allow the release of AFFF containing PFAS at the ATL Airport without adequate containment, remediation, or precaution to prevent PFAS from entering the Flint River basin.

131.   As a result of Atlanta's use and release of AFFF at the ATL Airport, PFAS has contaminated the Flint River and has reached Griffin's drinking water intakes at levels that exceed the EPA's 2024 Maximum Contaminant Levels. This contamination is ongoing.

132.   Atlanta has caused and contributed, and is still causing and contributing, to a continuous nuisance and trespass through its past and present use, discharge, and/or release of AFFF and PFAS at and from the ATL Airport.

133.   On April 3, 2026, within six months of the events giving rise to the claims asserted herein, Griffin sent a statutory ante-litem notice pursuant to O.C.G.A. § 36-33-5, via certified mail to Mayor Andre Dickens of the City of Atlanta, placing Atlanta on notice of the claims asserted herein, demanding a specific monetary amount constituting a statutory offer of compromise, and affording Atlanta thirty (30) days to respond. More than thirty (30) days have elapsed since transmission of the notice, and Atlanta has failed to settle or otherwise resolve Griffin's claims within the time required by O.C.G.A. § 36-33-5(c).

IV.    **"End-of-Life" PFAS Management**

134.    According to the EPA, Subtitle D (Municipal Solid Waste) landfills represent significant sources of PFAS to the environment, particularly those landfills that accept "special waste" containing higher concentrations of PFAS, such as wastewater sludge or manufacturing waste.

135.    Because of these concerns, the EPA officially recommends disposal of PFAS waste at Subtitle C (Hazardous Waste) landfills, particularly when the levels of PFAS in landfill waste are relatively high. Subtitle C landfills are subject to more stringent containment requirements than traditional Subtitle D landfills.

136.    The Rolling Hills Landfill is a Subtitle D landfill that accepts or accepted both regular household waste and PFAS-containing special waste from industrial manufacturing facilities. Upon information and belief, the Rolling Hills Landfill also accepts, or has accepted in the past, wastewater treatment plant sludge that contains PFAS.

137.    Leachate is a form of liquid waste present in Subtitle D landfills, like the Rolling Hills Landfill. According to the EPA, leachate forms when rainwater percolates through landfill wastes, leaching chemicals or constituents from those wastes. In essence, landfill leachate takes on the chemical characteristics of the landfill waste that it passes through.

138.    Landfill leachate is typically either treated on-site or shipped off-site to a municipal wastewater treatment plant for treatment.

139.    When rainwater comes into contact with the PFAS-containing waste within the Rolling Hills Landfill, it generates PFAS-contaminated leachate. Upon information and belief, the Rolling Hills Landfill's leachate contains high levels of PFAS, including PFOS and PFOA.

140.    The Rolling Hills Landfill discharges its PFAS-contaminated leachate directly into Sullivan Creek, in violation of its applicable permits, and/or via leachate disposal into wastewater treatment plants.

141.    The Landfill Defendants have known for years that industrial wastes containing PFAS can contaminate both on-site and off-site groundwater and surface water.

142.    The presence of PFAS in landfill waste—and, as a result, landfill leachate, groundwater and surface water—has been widely reported on in newspapers, trade publications, and scholarly reports for more than a decade.

143.    Likewise, solid waste industry groups, such as the Solid Waste Association of North America, have for years published reports to the solid waste industry that conventional wastewater treatment plants are incapable of removing PFAS from leachate and that reverse osmosis and granular activated carbon are commercially-proven options for leachate PFAS removal.

144.    The Landfill Defendants hold themselves out as experts in PFAS disposal and management, with on-site pretreatment options, Subtitle C Hazardous Landfills, and other technologies capable of limiting the re-introduction of PFAS into the environment.

145.    Despite the Landfill Defendants' knowledge concerning the potential for PFAS-contaminated landfill leachate to harm the environment and public health, the Landfill Defendants failed to prevent the escape and discharge of PFAS-contaminated leachate from its landfill, in violation of its permits.

146.    The Landfill Defendants have known, or should have known, for years that they cannot prevent the escape and discharge of PFAS-contaminated leachate into the environment, yet the Rolling Hills Landfill continued to accept PFAS-contaminated special waste.

### V.    PFAS Regulations

147.    On April 10, 2024, EPA announced the final, enforceable National Primary Drinking Water Regulation ("NPDWR") for six PFAS in drinking water: PFOA, PFOS, PFBS, PFNA, PFHxS, and Gen-X. The EPA's NPDWR—which was not made effective until June 2024—set legally enforceable Maximum Contaminant Levels ("MCLs") for these six PFAS.

148.    In 2025, the EPA and its newly-appointed Administrator, Lee Zeldin, undertook a second-round review of the NPDWR and reaffirmed its intention to regulate PFOA and PFOS in drinking water. In doing so, Administrator Zeldin and the EPA made clear the EPA's policy to hold polluters accountable in reaching compliance with PFOS and PFOA drinking water limits.

149.    Under the NPDWR, public water systems, like Plaintiff's, will be required to monitor and report concentrations of PFAS in their drinking water. The NPDWR will also require public water systems to provide drinking water with no more than 4 ppt PFOS or 4 ppt PFOA.

150.    In announcing the new regulations, EPA stated that it "expects that over many years the final rule will prevent PFAS exposure in drinking water for approximately 100 million people, prevent thousands of deaths, and reduce tens of thousands of serious PFAS-attributable illnesses." Pursuant to the NPDWR, EPA also established "health-based" Maximum Contaminant Level Goals ("MCLGs") for PFOA and PFOS at zero ppt.

151.    The EPA explained the decision-making process behind the MCLGs: "Following a systematic review of available human epidemiological and animal toxicity studies, EPA has determined that PFOA and PFOS are likely to cause cancer (e.g., kidney and liver cancer) and that there is no dose below which either chemical is considered safe."

152.    Finally, on April 19, 2024, the EPA formally designated PFOA and PFOS as "Hazardous Substances" under the Comprehensive Environmental Response, Compensation, and

Liability Act ("CERCLA"). According to the EPA, the designation of PFOA and PFOS as "Hazardous Substances" under CERCLA "is designed to ensure that those responsible for contamination pay to clean it up."

## VI.    Fate and Transport

153.    All of the Defendants have caused or contributed to the PFAS in the Flint River basin and Plaintiff's source water supply.

154.    Upon information and belief, the following Defendants have manufactured, formulated, sold, supplied and/or transported PFAS and/or PFAS-containing products to PFAS Users that were ultimately discharged, directly or indirectly, into Plaintiff's water supply: 3M, Chemours, Daikin, DuPont and/or Fictitious Defendants A-E.

155.    Upon information and belief, the following Defendants have directly discharged, whether through an NPDES permit or otherwise, PFAS and/or wastewater containing PFAS into the Flint River basin and Plaintiff's source water supply: Luck Stone, and/or Fictitious Defendants F-U.

156.    The City of Atlanta, through its operation of the ATL Airport and its use of civilian AFFF, has discharged PFAS directly into the Flint River basin. The ATL Airport is situated adjacent to the Flint River in Clayton County, and its stormwater drainage, groundwater, and other discharges flow directly into the Flint River and hydrologically connected waterways upstream of Griffin's drinking water intakes.

157.    Upon information and belief, the following Defendants have discharged PFAS and/or wastewater containing PFAS to Clayton County Water Authority's ("CCWA") W.B. Casey Water Resource Recovery Facility ("WRRF"), which passed through the wastewater treatment system located within and hydrologically connected to the Flint River basin, thereby impacting

waters within the basin and Plaintiff's source water supply: Clorox, Express Container, Sherwin Williams, Tensar, and/or Fictitious Defendants F-U.

158.    Upon information and belief, the following Defendants have discharged PFAS and/or wastewater containing PFAS to Henry County Water Authority's ("HCWA") Bear Creek Water Reclamation Facility ("BCWRF"), which passed through the wastewater treatment system and onto HCWA's land application system, which is located within and hydrologically connected to the Flint River basin, thereby impacting waters within the basin and Plaintiff's source water supply: Atlas Roofing and/or Fictitious Defendants F-U.

159.    Upon information and belief, the Rolling Hills Landfill has discharged PFAS-contaminated leachate into an unnamed tributary to Sullivan Creek directly and/or via leachate disposal into wastewater treatment plants, contributing PFAS to the Flint River basin and Plaintiff's source water supply.

VII.    **PFAS POLLUTION IN AND AROUND PLAINTIFF'S WATER SUPPLY**

160.    Plaintiff draws its primary source water from Flint River, which is treated at the Harry Simmons Water Treatment Plant ("Harry Simmons WTP") and the Dr. Brant D. Keller Water Treatment Plant ("Dr. Brant D. Keller WTP").

161.    PFAS pollution caused by the Defendants has jeopardized the safety of the Plaintiff's raw water and drinking water sources and related tributaries and watersheds as an ongoing source of drinking water for the residents of Griffin, Georgia, and the surrounding areas.

162.    Upstream from Griffin's Harry Simmons WTP and Dr. Brant D. Keller WTP drinking water intakes, the PFAS Users operate manufacturing facilities that in the past and/or currently discharge PFAS into the Flint River directly and/or via PFAS-contaminated industrial wastewater discharges to wastewater treatment plants incapable of removing PFAS. The ATL

Airport also sits upstream of Griffin's drinking water intakes and has discharged and continues to discharge PFAS into the Flint River basin. These PFAS were in the past, and in some cases still today, manufactured and sold by the Chemical Manufacturer Defendants.

163. WM owns, operates and/or maintains the Rolling Hills Landfill that has accepted PFAS-contaminated wastes from the PFAS Users and other sources and thereafter discharged PFAS-contaminated leachate into an unnamed tributary to the Flint River directly and/or via leachate disposal into wastewater treatment plants. In some instances, the discharges began over thirty (30) years ago and yet continue to this day.

164. Defendants have known or should have known that PFAS cannot be removed by conventional wastewater treatment methods and that the Defendants' PFAS-contaminated wastewater passes directly through the wastewater treatment system and back into the aforementioned waterways upstream of Griffin's drinking water intake.

165. As a result of Defendants' manufacture, use, disposal, and discharge of PFAS and/or products and waste that contain or degrade into PFAS, dangerously high levels of PFAS have been detected in the waterways surrounding Plaintiff's drinking water intakes and related tributaries and watersheds. The levels of PFAS detected far exceed EPA's most recent Health Advisory and proposed Maximum Contaminant Levels and Maximum Contaminant Level Goals.

166. Levels of PFOS and PFOA have been detected at the Harry Simmons WTP as high as 14.0 ppt and 9.7 ppt, respectively.

167. PFOS and PFOA have also been detected at the Dr. Brant D. Keller WTP.

168. Short-chain PFAS have also been detected at both of Plaintiff's Water Treatment Plants, including PFHxS at Harry Simmons WTP and at the Dr. Brant D. Keller WTP.

169.    Because of their persistence and bioaccumulation, PFAS discharged into the waterways that supply Plaintiff's drinking water five (5), ten (10), or even twenty (20) years ago are still present in Plaintiff's water supply and still impacting Plaintiff's ability to provide clean drinking water to its customers. These "forever chemicals" will continue to pollute Plaintiff's water supply for generations to come—unless and until they are removed through very specific filtration methods.

170.    Scientific experts, including several of the Defendants' own scientists and consultants, agree that PFOS and PFOA do not readily degrade and will remain in the environment for centuries.

171.    Because Plaintiff's water treatment plants, like most water treatment plants in the country, are incapable of removing PFAS, Plaintiff's raw and finished water both contain levels of "forever chemicals" much higher than that which is allowed by EPA under the 2024 National Primary Drinking Water Regulation.

## COUNT I – NEGLIGENCE

172.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

173.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, disposers, and/or handlers of PFAS, products containing and/or degrading into PFAS (including AFFF), products manufactured using PFAS (including AFFF), and/or waste containing and/or degrading into PFAS (including wastes and runoff from AFFF), Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, in their handling, control, use, and disposal of PFAS.

174. As manufacturers and suppliers of a dangerous product that would foreseeably cause harm to the City of Griffin through the ordinary and intended use of that product, the Chemical Manufacturer Defendants owed a duty to the City of Griffin as a foreseeably endangered third party.

175. As users, handlers, and disposers of dangerous products that would foreseeably cause harm to the City of Griffin through the ordinary and intended use of those products, the PFAS Users and Atlanta owed a duty to the City of Griffin as a foreseeably endangered third party.

176. The Georgia Water Quality Control Act ("GWQCA") regulations specify that all waters of the State of Georgia shall be free from: "industrial waste or other discharges in amounts sufficient to be unsightly or to interfere with legitimate water uses" Ga. Comp. R. & Regs. § 391-3-6-.03(5)(b); "industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses" Ga. Comp. R. & Regs. § 391-3-6-.03(5)(c); "toxic, corrosive, acidic and caustic substances discharged from . . . industries or other sources, such as nonpoint sources, in amounts, concentrations or combinations which are harmful to humans, animals or aquatic life" Ga. Comp. R. & Regs. § 391-3-6-.03(5)(e).

177. Pursuant to O.C.G.A. § 12-5-51, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, to avoid intentionally or negligently causing or permitting any sewage, industrial wastes, other wastes, or other substance or substances to be discharged or deposited in the waters of the State of Georgia.

178. Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, to exercise reasonable care in their manufacturing and marketing procedures and waste-handling and disposal operations to prevent the discharge of toxic PFAS chemicals into the Plaintiff's drinking water supply, water treatment plant, and related property.

- 40 -

179.    Further, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, to comply with permits, to comply with state and local laws and regulations, and to prevent the discharge of PFAS into the Plaintiff's water supply and related property.

180.    As described in detail above, Defendants breached their duty to exercise due care and reasonable care owed to the Plaintiff. The Defendants knew or should have known that their PFAS is persistent in the environment and bioaccumulative and toxic to humans and wildlife. The Defendants also knew or should have known that conventional water filtration systems are incapable of removing PFAS from environmental media, and that the Plaintiff's current filtration systems would be incapable of removing Defendants' PFAS from its drinking water supply. The Defendants' breaches of their duties to Plaintiff constitute negligent, willful, and/or reckless conduct.

181.    Plaintiff has a reasonable expectation that Defendants avoid contaminating Plaintiff's drinking water supply, Plaintiff's property, and the surrounding environment—an expectation that extends to the pollution of the area's source water supply.

182.    As a direct, proximate, and foreseeable result of Defendants' conduct, practices, actions, and omissions, the Plaintiff has been damaged and has incurred expenses and will continue to incur expenses in the future.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by struck jury in an amount in excess of the jurisdictional minimum of this Court, including past and future damages, plus interest in all recoverable costs.

## COUNT II – PUBLIC NUISANCE

- 41 -

183.    Plaintiff realleges all prior paragraphs as if fully restated and set forth herein.

184.    Defendants have created and continue to create and contribute to a public nuisance by failing to prevent the contamination of the surface water where Plaintiff obtains its drinking water and, as a direct result, Plaintiff's water supply, water treatment system, and related property with Defendants' PFAS, thereby causing Plaintiff hurt, inconvenience, and harm. The nuisance is ongoing.

185.    The contamination of Plaintiff's water supply, water treatment system, and related property constitutes a public nuisance, which is causing Plaintiff damages that are separate and distinct from those faced by the general public, including but not limited to: expenses associated with installing, maintaining, and operating filtration systems; costs associated with remediating Plaintiff's existing treatment facilities; damage to goodwill and reputation; and lost revenue and sales.

186.    In addition to the special damages suffered by Plaintiff, the Defendants' PFAS contamination has created a condition that threatens the health and well-being of residents of Griffin, Georgia, including Plaintiff's customers.

187.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, Plaintiff's water supply. The nuisance has caused substantial damage and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiff's water supply.

188.    Defendants knew that their acts and omissions would cause Plaintiff's drinking water supply to become contaminated by PFAS. Defendants have acted with a conscious

indifference to the dangerous consequences of their actions and the reasonably foreseeable impact such actions would have on public health, safety and welfare.

189.    Each of the Defendants controlled the cause of the nuisance and had a legal right to abate the nuisance at all relevant times. The Chemical Manufacturer Defendants actively exercised direction and control over the information provided to their customers and the general public, as well as certain customers' use and application of the products at issue.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT III – PRIVATE NUISANCE

190.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

191.    Plaintiff owns and occupies property used to serve its water customers, including water intake sites, a water distribution system, water treatment plants, offices, and associated facilities and equipment.

192.    Plaintiff owns land and water rights which permit it to withdraw raw water from the Flint River in order to treat and sell drinking water for its customers.

193.    Defendants have created and are continuing to create and contribute to a nuisance by their failure to prevent the contamination of PFAS in the Plaintiff's water supply, thereby causing Plaintiff hurt, inconvenience, and harm. Each Defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

194.    The contamination of the water at Plaintiff's reservoirs or surface water sources, treatment systems, and related property constitutes a private nuisance depriving Plaintiff of its

ability to deliver clean and uncontaminated water to its customers. The nuisance created by Defendants' PFAS is continuous and ongoing.

195.    It was reasonably foreseeable, and in fact known to Defendants, that their actions would contaminate, and have contaminated, the water at Plaintiff's reservoirs or surface water sources. The nuisance has caused substantial damage and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of filtration technology that will allow for the removal of PFAS from Plaintiff's water supply.

196.    Defendants' nuisance has caused substantial damages and will continue to cause damages until Plaintiff receives compensatory damages for the necessary improvements of treatment technology that will allow for the removal of PFAS from Plaintiff's water supply.

197.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has incurred, is incurring, and will continue to incur damages related to PFAS contamination.

198.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage to Plaintiff's property, including PFAS contamination of Plaintiff's water supply. Defendants committed each of the above-described acts and omissions willfully and with malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences in order to promote sales of their products and/or services. Plaintiff therefore demands an award of punitive damages because of the aggravating circumstances alleged herein in order to penalize, punish, and deter Defendants' conduct.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT IV – TRESPASS

199.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

200.    Plaintiff owns and occupies property used to serve its water customers, including water treatment systems, water distribution system, and offices. Plaintiff owns land and water rights which permit it to withdraw raw water from the Flint River in order to treat and sell drinking water for its customers.

201.    Defendants' intentional acts, done with substantial certainty and/or reasonable foreseeability that they would contaminate Plaintiff's water supply, caused an invasion of Plaintiff's possessory interest in its property by Defendants' chemicals, which has affected and is affecting Plaintiff's interest in the exclusive possession of its property.

202.    Under O.C.G.A. § 51-9-7, the owner of land through which non-navigable watercourses flow is entitled to have such water in its natural and usual flow, free from pollution. "The polluting thereof so as to lessen its value to the owner of such land shall constitute a trespass upon the property."

203.    As landowner of property through which non-navigable watercourses flow, Plaintiff is entitled to water that is clean, safe, and free of Defendants' pollution and toxic contamination.

204.    Plaintiff has at no time consented to the contamination of its water supply or the invasion of its property and possessory interests by Defendants' PFAS.

- 45 -

205.     Defendants knew or should have known that their manufacture, use, purchase, sale, supply, disposal, discharge, and/or release of PFAS and PFAS-containing products or waste would contaminate the water supply and result in an invasion of Plaintiff's possessory interest in its property.

206.     Defendants' trespass is continuing. The contamination resulting from Defendants' trespass has migrated and spread and will continue to migrate and spread. Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused Plaintiff's substantial damages.

207.     Defendants' continuing trespass has impaired Plaintiff's use of its property and has caused Plaintiff substantial damages.

WHEREFORE, Plaintiff demands judgment for compensatory damages against all Defendants, jointly and severally, in an amount to be determined by a struck jury in an amount in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

### COUNT V – GEORGIA WATER QUALITY CONTROL ACT

208.     Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

209.     Under O.C.G.A. § 12-5-51, "any person who intentionally or negligently causes or permits any sewage, industrial wastes, or other wastes, oil, scum, floating debris, or other substance or substances to be spilled, discharged, or deposited in the waters of the state, resulting in a condition of pollution as defined by this article, shall be liable in damages to the state and any political subdivision thereof for any and all costs, expenses, and injuries occasioned by such spills, discharges, or deposits."

210.     Each Defendant is a "person" within the meaning of O.C.G.A. § 12-5-51.

211.    Defendants intentionally or negligently caused or permitted PFAS to be deposited into the Flint River, and ultimately Griffin's water supply, resulting in a condition of pollution as defined by Georgia Code Title 12, Chapter 5, Article 2.

212.    PFAS are industrial wastes within the meaning of O.C.G.A. § 12-5-51.

213.    The amount of the damages assessed pursuant to O.C.G.A. § 12-5-51 "shall include, but shall not be limited to, any costs and expenses reasonably incurred by the state or any political subdivision thereof, as the case may be, in cleaning up and abating such spills, discharges, or deposits, and any costs and expenses reasonably incurred in replacing aquatic life destroyed by such spills, discharges, or deposits. . . .  Damages to a political subdivision shall be recoverable in a civil action instituted by such subdivision."

214.    The City of Griffin, Georgia is a political subdivision of the State of Georgia under the GWQCA.

215.    As a direct and proximate result of Defendants' conduct, Plaintiff has incurred, and will continue to incur, damages including, but not limited to, the costs and expenses set forth in O.C.G.A. § 12-5-51.

**COUNT VI – FAILURE TO WARN**
**(CHEMICAL MANUFACTURER DEFENDANTS ONLY)**

216.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

217.    The Chemical Manufacturer Defendants had a duty to warn and a continuing duty to warn its customers, regulators, and the public of dangers associated with the design, manufacture, disposal, use, and operation of PFAS (particularly PFOS and PFOA).

218.    As manufacturers and suppliers of a dangerous product that would foreseeably cause harm to the City of Griffin through the ordinary and intended use of that product, the

- 47 -

Chemical Manufacturer Defendants had a duty to warn Griffin of such foreseeable dangers and/or take measures to prevent the foreseeable and expected dangerous condition harming the City of Griffin.

219.    The Chemical Manufacturer Defendants are aware, and have been aware for decades, or should have been aware, of the dangers and hazards associated with the design, manufacture, disposal, use, and operation of PFAS.

220.    The Chemical Manufacturer Defendants failed to warn the public, regulators, and/or their customers of the problems, risks, hazards and/or dangers associated with PFAS.

221.    The Chemical Manufacturer Defendants exercise control of the information they disclose and share concerning the hazards of their chemicals.  The Chemical Manufacturing Defendants continue to fail to warn or adequately warn the public and current and former customers of the problems, risks, hazards and/or dangers associated with PFAS.

222.    As a direct and proximate result of the Chemical Manufacturer Defendants' failures to warn of these dangerous and hazardous conditions, Plaintiff has suffered significant damages, including but not limited to past, present, and future costs associated with remediating and removing PFAS from its drinking water supply.

### COUNT VII – PUNITIVE DAMAGES

223.    Plaintiff incorporates all prior paragraphs by reference as if fully set forth and restated herein.

224.    As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, disposers, and/or handlers of PFAS products containing and/or degrading into PFAS, products manufactured using PFAS, and/or waste containing and/or degrading into PFAS,

Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, in their manufacture, marketing, handling, control, use, and disposal of PFAS.

225.    Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS might foreseeably harm, to exercise reasonable care in their manufacturing procedures and waste-handling and disposal operations to prevent the discharge of toxic PFAS chemicals into the Plaintiff's water supply, water intakes, water treatment plant, water distribution system, and related property.

226.    In breaching the duties described above, Defendants' actions demonstrated willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care which would raise the presumption of conscious indifference to consequences.

227.    Defendants knew or should have known that exposure to PFAS and water contaminated by PFAS is hazardous to the environment and to human health.

228.    Defendants knew or should have known the danger to Plaintiff created by Defendants' conduct, practices, actions, and inactions.

229.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiff.

230.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiff's property.

231.    Plaintiff is entitled to punitive damages against all Defendants, jointly and severally, in an amount to be determined by the enlightened conscience of an impartial jury in excess of the jurisdictional minimum of this Court, past and future, plus interest and costs.

## COUNT VIII – ATTORNEYS' FEES AND EXPENSES OF LITIGATION

232.    Plaintiff re-alleges all prior paragraphs as if set forth fully herein.

233.    Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense such that Plaintiff is entitled to recover its attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

## RELIEF DEMANDED

Wherefore, Plaintiff respectfully requests this Court grant the following relief:

a)    Award Plaintiff damages in an amount to be determined by a jury sufficient to compensate Plaintiff for past and future damage, out-of-pocket expenses, and lost profits and sales;

b)    Issue an injunction requiring Defendants to abate their nuisance and/or otherwise remove their chemicals from Plaintiff's water supply and to prevent these chemicals from continuing to contaminate Plaintiff's water supply;

c)    Award punitive damages;

d)    Award attorney fees and costs and expenses incurred in connection with the litigation of this matter; and

e)    Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY DEMAND

PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES OF THIS CAUSE.

Respectfully submitted this 14th day of May, 2026.

**DAVIS LUCAS CARTER LLP**

210 East 2nd Avenue, Suite 301          */s/ J. Anderson Davis*
Rome, GA 30161                          J. ANDERSON DAVIS

- 50 -

Phone: 706-842-7555
adavis@davislucascarter.com

Georgia Bar No. 211077
**Counsel for Plaintiff**


**THE WHALEN LAW FIRM LLC**


101 S Hill St.
Griffin, GA 30223
Phone: 770-227-9456
ajwhalen3@whalenlaw.net

*/s/ Andrew J. Whalen, III*
ANDREW J. WHALEN, III
Georgia Bar No. 750625
**Counsel for Plaintiff**


**MCCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP**


411 West Crawford Street
Dalton, GA 30720
Phone: 706-278-4499
rsmalley@mccamylaw.com

*/s/ Robert Smalley*
ROBERT SMALLEY
Georgia Bar No. 653405
**Counsel for Plaintiff**


**FRIEDMAN, DAZZIO & ZULANAS, P.C.**


3800 Corporate Woods Drive
Birmingham, AL 35242
Phone: 205-278-7000
mconn@friedman-lawyers.com
lpatterson@friedman-lawyers.com
mlakes@friedman-lawyers.com
ewright@friedman-lawyers.com

*/s/ Matt Conn*
MATT CONN (CON062)
LEE PATTERSON (PAT060)
MADISON LAKES (GIT002)
ETHAN WRIGHT (WRI082)
**Counsel for Plaintiff**
*(Pro Hac Vice Forthcoming)*


**<u>PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL AT</u>:**

3M COMPANY
c/o Corporation Service Company
2 Sun Court
Suite 400
Peachtree Corners, GA, 30092

ATLAS ROOFING CORPORATION OF MISSISSIPPI
c/o C T Corporation System
289 S Culver St.

Lawrenceville, GA, 30046-4805

CLOROX MANUFACTURING COMPANY
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

CORTEVA, INC.
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046

DAIKIN AMERICA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801

DUPONT DE NEMOURS, INC.
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

E.I. DUPONT DE NEMOURS AND COMPANY
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

EIDP, INC.
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

EXPRESS CONTAINER SERVICES OF ATLANTA, LLC
c/o Michael Denney
1675 Nolan Ct.
Morrow, GA, 30260

GEORGIA WASTE SYSTEMS, LLC
c/o The Corporation Company
410 Peachtree Parkway
Suite 4245
Cumming, GA, 30041

STEPHENS INDUSTRIES, LLC
c/o Brendan Thomas

- 52 -

600 Peachtree St NE,
Suite 3000
Atlanta, GA, 30308

TENSAR INTERNATIONAL CORPORATION
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

THE CHEMOURS COMPANY
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

THE CHEMOURS COMPANY FC, LLC
c/o C T Corporation System
289 S Culver St.
Lawrenceville, GA, 30046-4805

THE CITY OF ATLANTA, GEORGIA
c/o Mayor, Andre Dickens
Atlanta City Hall
55 Trinity Avenue SW
Suite 2900
Atlanta, GA 30303-3584

and

c/o Ricky Smith
General Manager, Department of Aviation
P.O. Box 20509
Atlanta, GA 30320

THE SHERWIN-WILLIAMS COMPANY
c/o Corporation Service Company
2 Sun Court, Suite 400
Peachtree Corners, GA, 30092

WASTE MANAGEMENT OF GEORGIA, INC.
c/o The Corporation Company
410 Peachtree Parkway
Suite 4245
Cumming, GA, 30041

EFILED
CLAYTON COUNTY, GA
5/14/2026 8:40 AM
Chanae Q. Clemons
CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **THE CITY OF GRIFFIN, GEORGIA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case Number: 2026CV01325-10** |
| | ) |
| **3M COMPANY, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that I have served the foregoing *Motion for Leave to Amend Complaint and Brief in Support* via eService using the Odyssey eFileGA system and to the following party at interest via United States Mail, postage prepaid:

City of Atlanta, Georgia
c/o Mayor, Andre Dickens
Atlanta City Hall
55 Trinity Avenue SW
Suite 2900
Atlanta, GA 30303-3584

and

c/o Ricky Smith
General Manager, Department of Aviation
P.O. Box 20509
Atlanta, GA 30320

This 14th day of May, 2026.

**DAVIS LUCAS CARTER LLP**

| | |
|---|---|
| 210 East 2nd Avenue, Suite 301 | */s/ J. Anderson Davis* |
| Rome, GA 30161 | J. ANDERSON DAVIS |
| Phone: 706-842-7555 | Georgia Bar No. 211077 |
| adavis@davislucascarter.com | **Counsel for Plaintiff** |

- 54 -

## IN THE SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| THE CITY OF GRIFFIN, GEORGIA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case Number: 2026CV01325-10** |
| | ) | |
| 3M COMPANY, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

### ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT

The above matter came before this Court on Plaintiff's Motion for Leave to Amend its Complaint and Brief in Support. Defendants have not yet had an opportunity to respond to the Motion for Leave to Amend Complaint; however, the Court concludes that no response from Defendants is necessary, because the requested leave to amend is reasonable and will not cause significant, if any, prejudice to Defendants. The Court further concludes that granting this motion is within the Court's discretion, that this case is in its early stages, and granting this motion will promote judicial economy. Plaintiff's Motion has been read and considered, and it appears to this Court that sufficient grounds exist to grant the Motion.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Leave to Amend Complaint is hereby **GRANTED**. The proposed Amended Complaint (Exhibit A to Plaintiff's Motion) is deemed filed, and the City of Atlanta, Georgia, is hereby made a Defendant in this action. The Clerk of Superior Court is directed to issue summons to the City of Atlanta, Georgia to be served according to law along with the Amended Complaint.

**IT IS SO ORDERED**, this ___ day of May, 2026.

_____
**Judge Shana Rooks Malone**
Clayton County Superior Court
Clayton Judicial Circuit

AP

Prepared and presented by:

**DAVIS LUCAS CARTER LLP**

210 East 2nd Avenue, Suite 301          /s/ J. Anderson Davis
Rome, GA 30161                          J. ANDERSON DAVIS
Phone: 706-842-7555                     Georgia Bar No. 211077
adavis@davislucascarter.com             **Counsel for Plaintiff**


**THE WHALEN LAW FIRM LLC**

101 S Hill St.                          /s/ Andrew J. Whalen, III
Griffin, GA 30223                       ANDREW J. WHALEN, III
Phone: 770-227-9456                     Georgia Bar No. 750625
ajwhalen3@whalenlaw.net                 **Counsel for Plaintiff**


**MCCAMY, PHILLIPS, TUGGLE & FORDHAM, LLP**

411 West Crawford Street                /s/ Robert Smalley
Dalton, GA 30720                        ROBERT SMALLEY
Phone: 706-278-4499                     Georgia Bar No. 653405
rsmalley@mccamylaw.com                  **Counsel for Plaintiff**


**FRIEDMAN, DAZZIO & ZULANAS, P.C.**

3800 Corporate Woods Drive              /s/ Matt Conn
Birmingham, AL 35242                     MATT CONN (CON062)
Phone: 205-278-7000                     LEE PATTERSON (PAT060)
mconn@friedman-lawyers.com              MADISON LAKES (GIT002)
lpatterson@friedman-lawyers.com         ETHAN WRIGHT (WRI082)
mlakes@friedman-lawyers.com             **Counsel for Plaintiff**
ewright@friedman-lawyers.com            *(Pro Hac Vice Forthcoming)*

EFILED
CLAYTON COUNTY, GA
5/14/2026 8:40 AM
Chanae Q. Clemons
CLERK SUPERIOR COURT

## IN THE SUPERIOR COURT OF CLAYTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **THE CITY OF GRIFFIN, GEORGIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case Number: 2026CV01325-10** |
| | ) | |
| **3M COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that I have served the foregoing proposed ***Order on Plaintiff's Motion for Leave to Amend Complaint*** via eService using the Odyssey eFileGA system and to the following party at interest via United States Mail, postage prepaid:

City of Atlanta, Georgia
c/o Mayor, Andre Dickens
Atlanta City Hall
55 Trinity Avenue SW
Suite 2900
Atlanta, GA 30303-3584

and

c/o Ricky Smith
General Manager, Department of Aviation
P.O. Box 20509
Atlanta, GA 30320

This 14th day of May, 2026.

**DAVIS LUCAS CARTER LLP**

| | |
|---|---|
| 210 East 2nd Avenue, Suite 301 | By:     */s/ J. Anderson Davis* |
| Rome, GA 30161 | J. ANDERSON DAVIS |
| Phone: 706-842-7555 | Georgia Bar No. 211077 |
| adavis@davislucascarter.com | **Counsel for Plaintiff** |